**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**CAROL JEAN GANG,**

    **Plaintiff,**

    **v.**

**COMMISSIONER OF SOCIAL SECURITY,**

    **Defendant.**

        **Civil Action 2:20-cv-3267**
        **Judge Edmund A. Sargus, Jr.**
        **Magistrate Judge Elizabeth P. Deavers**

## REPORT AND RECOMMENDATION

Plaintiff, Carol Jean Gang, brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for supplemental security income ("SSI"). Pending before the Court is Plaintiff's Statement of Errors (ECF No. 7), the Commissioner's Memorandum in Opposition (ECF No. 9), and the administrative record (ECF No. 6). For the reasons that follow, the Undersigned **RECOMMENDS** that the Court **OVERRULE** Plaintiff's Statement of Errors, and **AFFIRM** the Commissioner's non-disability determination.

## I.    BACKGROUND

Plaintiff filed a previous application seeking SSI and disability insurance benefits ("DIB") on October 4, 2007 and alleged that she had become disabled on June 30, 2004. (R. at 81.) Those applications were denied initially and on reconsideration in 2008. (*Id*.) Plaintiff filed an application for child's disability benefits in 2009, and because of the commonality of issues, it was escalated to be heard with her 2007 SSI and DIB applications. (*Id*.) In 2010, A hearing was held before Administrative Law Judge Nino A. Sferrella ("ALJ Sferrella") who issued an unfavorable determination on July 20, 2010, finding that Plaintiff was not disabled

under any of the applicable provisions of the Social Security Act from June 30, 2004, through the date of that determination.

Plaintiff subsequently filed the instant SSI application in 2017 and alleged that she became disabled on October 1, 2004. (R. at 207, 213.) Plaintiff's application was denied initially and upon reconsideration. (R. at 95–110, 111, 112–128, 129.) After presiding over a hearing on January 25, 2019, Administrative Law Judge Virginia Herring ("ALJ Herring") issued a decision on April 5, 2019, finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. at 12–34.) AJL Herring's determination became final when the Appeals Council denied Plaintiff's request for administrative review on April 27, 2020. (R. at 1–6.)

Plaintiff timely commenced this action alleging that ALJ Herring erred by failing to properly analyze whether she met the requirements for Listings 1.04A and 12.05. (ECF No. 7, at PageID #828–30, 820–25.) Plaintiff additionally alleges that ALJ Herring erred when performing a subjective-symptom analysis. (*Id*. at PageID #825–27.) The Undersigned finds that Plaintiff's allegations of error lack merit.

## II.    RELEVANT RECORD EVIDENCE

### A.    Plaintiff's Testimony

At the January 25, 2019, hearing, Plaintiff testified to the following about her physical impairments. She was prevented from working by a lumbar fusion done in May 2017 because the hardware was pinching her left sciatic nerve and causing sharp pain that did not stop, numbness in her thighs, pain in her calves, and her feet to be frozen. (R. at 49–50, 69–70.)

According to Plaintiff, her surgeon refused to brace her after her surgery. Plaintiff fell in August of 2017, and it jolted the hardware which was now crooked. (R. at 60.) She took nerve damage medication for her back pain and avoided certain positions such as sitting up or bending. (R. at 50.) If she was laying on her side or "kind of cockeyed" she was fine. (R. at 50.) It also throbbed where her incision was located. (R. at 54.) She took things easy or did things "very lightly." (R. at 50–51.) She had an MRI with a new surgeon scheduled to take place in February of 2019. (R. at 54.) She could probably stand for an hour so long as she could keep moving and shifting her weight. (R. at 57.) Walking was less painful than standing. (*Id*.) Going up stairs, however, was very painful. (R. at 58.) She had difficulty bending to do laundry. (R. at 59.)

Plaintiff also testified to the following about her mental impairments. She was prevented from working by public anxiety. (R. at 48.) Plaintiff's parents took her to small stores to do shopping. (R. at 58.) Since 2016, a behavioral specialist from Integrated Services would get Plaintiff from her home and accompany her to the store if her parents could not do so. (R. at 59–60.) The behavioral specialist also accompanied her to doctor appointments. (*Id*.) She took Ativan about ten minutes before she would leave the house and she would be fine. (R. at 61.) She did not, however, go places by herself. (R. at 63, 64.) On average, she experienced twenty-five panic attacks a week. (R. at 64–65.) She had an IEP in school and had been diagnosed with ADHD. (R. at 65.) She had trouble with spelling, math, and reading. (R. at 65.) She also had trouble concentrating and experienced anger outbursts during which she could not refrain from speaking out about things she saw. (R. at 67–68.)

**B.** **Relevant Medical Records Related to Plaintiff's Physical Impairments**

1. Hocking Valley Medical Group, Inc.

On November 17, 2016, Plaintiff complained about sudden and persistent burning back pain. (R. at 439.) She related that she had fallen into a manhole three years prior and that her LS and L5 were deteriorating. (*Id*.) She reported that she had seen a specialist who recommended injections, but she had declined them. (R. at 440.) She was prescribed prednisone and Baclofen and advised to follow up if she saw no improvement. (*Id*.)

On November 29, 2016, Plaintiff reported that she injured her lower back in 2004 and that her left lower extremity pain had worsened on November 18, 2016. (R. at 444.) She was prescribed steroids, which made things feel better while she was taking them, but she was now experiencing numbness in the left lower extremity. (*Id*.) She rated her pain as a 6 on a 10-point scale. (*Id*.) Upon examination she had reduced lumbar lordosis. (R. at 444.) In her trunk range of motion, she had 78° flexion, 10° extension with increased left lower extremity pain, and 20° side bending. (R. at 445.) She had 4+/5 in all measures of lower right extremity strength. (*Id*.) She scored a 4/5 on all measures of lower left extremity strength except ankle dorsiflexion, which she scored a 4-/5. (*Id*.) There was tenderness to palpitation in the lumbar spine and left sciatic area and she had a positive straight leg test on the left. (*Id*.) It appeared that Plaintiff had good rehabilitation potential and she was to see a physical therapist twice a week for four weeks. (*Id*.)

Notes indicate that Plaintiff completed physical therapy appointments on November 29, 2016, and December 5, 2016, but she was a "no show" for her next scheduled appointment and

that she did not return to physical therapy after December 16, 2016. (R. at 442, 448–49.) It was noted that Plaintiff would be discharged from physical therapy absent a further referral. (R. at 442.)

### 2. Precision Pain Care in 2017

Plaintiff was examined at Precision Pain Care on February 1, 2017. (R. at 463.) The doctor who examined Plaintiff noted that X-rays of the lumbar spine done in 2011 revealed bilateral pars defect at L5 with grade 1 spondylolisthesis of L5 on S1. (*Id*.) Plaintiff had decreased range of motion of the lumbar spine with pain noted during extension. (*Id*.) Moderate tenderness to palpitation was noted along the lumbar paraspinal muscles and sacroiliac joint regions. (*Id*.) She had hypersensitivity to light touch along the lateral aspect of the left lower extremity. (*Id*.) Her patellar reflexes were 1-2 and equal bilaterally. (*Id*.) Her strength was 4/5 in all muscle groups in the lower extremities. (*Id*.) She had a positive straight leg raise on the left at 90° extension. (*Id*.) Daypro and X-rays of the lumbar spine were prescribed. (R.at 464.)

On February 5, 2017, X-rays of the lower spine revealed anterolisthesis of L5 on S1 associated with disc degeneration as well as degenerative changes at L3–L4. (R. at 465.) On March 7, 2017, it was recommended that Plaintiff receive epidural steroid injections. (*Id*.) Plaintiff received an injection on May 2, 2017 and was scheduled to return in four weeks. (R. at 466.) On May 30, 2017, Plaintiff failed to note a significant response to her initial injection but agreed to proceed with more. (R. at 763.) She also reported that Lodine was ineffective, and a trial of Naproxen was prescribed in its place. (*Id*.)

Plaintiff received another injection on July 18, 2017. (R. at 764.) On September 1, 2017, Plaintiff reported a greater than 60% reduction of her pain. (R. at 765.) She received another injection on October 23, 2017. (R. at 766.) On November 28, 2017, however, she failed to note significant lasting benefit from treatment. (R. at 767.) Plaintiff also had symptoms consistent with sacroiliitis. (*Id*.) It was recommended that treatment be redirected to that apparent component of her pain and that a lumbar MRI be obtained. (*Id*.) On December 21, 2017, Plaintiff received bilateral sacroiliac joint injections. (R. at 768.)

A December 29, 2017, MRI revealed Grade 1 anterolisthesis of L5 on S1 with chronic bilateral pars defects and moderate disc degeneration associated with mild to moderate bilateral foraminal stenosis. (R. at 770.) On January 2, 2018, she was referred for a surgical consultation. (R. at 770.) On March 19, 2018, it was recommended that Plaintiff increase her dosage of Neurontin to reduce the neuropathic component of her pain and that she continue using Naprosyn or Ibuprofen and a trial of Baclofen to reduce the muscular component of her pain. (R. at 771.)

3.      OSU Spine Compression Center

On April 24, 2018, Plaintiff underwent a pre-operative assessment. (R. at 573.) She was scheduled for surgery on May 11, 2018, but because she was positive for nicotine that day, her surgery had to be rescheduled. (R. at 573, 588.) On May 14, 2018, the following procedures were performed without complications: a posterior spinal decompression with laminectomy, a foraminotomy, and a facetectomy, lumbar 5 to sacral 1; and a posterior spinal fusion lumbar 5 to sacral 1. (R. at 606.)

Notes from a postoperative visit on May 29, 2018, indicate that a few days after her surgery, Plaintiff visited the emergency room for bilateral swelling and discharge. (R. at 631.) Plaintiff was prescribed Levaquin for presumed pneumonia and was doing well. (*Id*.) Her pain was controlled. (*Id*.) Imaging revealed that s/p L5-S1 PLIF were in appropriate alignment. (R. at 632.) She was OK to return to work with no bending, twisting, or lifting more than five pounds. (*Id*.)

Notes indicate that Plaintiff reported that she fell directly on her back on or around July 1, 2018, and that after that fall, she experienced pain radiating down her left leg. (R. at 635.) Plaintiff visited the emergency department after that fall where she was advised to see her surgeon. (*Id*.)

At a follow-up visit with her surgeon on July 11, 2018, Plaintiff was doing fairly well and was trying to wean off Norco. (R. at 633.) She was ambulating without the use of an assistive device and her preoperative pain was improving. (*Id*.) Her sensation was intact to light touch. (R. at 634.) A seated straight leg test, however, recreated her pain in a non-dermatomal patten in her right lower extremity. (*Id*.) Imaging again revealed that s/p L5-S1 PLIF were in appropriate alignment. (*Id*.) She was given a prescription to start physical therapy in six weeks. (*Id*.)

Notes dated August 23, 2018, indicate that Plaintiff reported that her surgeon did not address her post-fall concerns. (R. at 635.) Upon examination, Plaintiff's her lumbar range of motion was 50/90 flexion with pain, 15/30 extension with pain, and 20/20 bilaterally without pain. (R. at 638.) She had 5/5 strength in her hip flexion, adduction, and abduction bilaterally. (*Id*.) She also had 5/5 strength in her knee flexion and extension; 4/5 in her right ankle DF and

PF; and 4+/5 in her left ankle DF and PF. (*Id*.) She was positive for a seated straight leg raising test on the left but not the right. (R. at 639.) The July 1, 2018, imaging was reviewed. There was no evidence of a compression fracture of the spine even though the laminectomy and chronic, degenerative, and postsurgical changes were noted. (R. at 640.) It was determined that a lumbar MRI was needed. (R. at 641.)

Additional X-Rays were done on September 13, 2018. (R. at 642–43.) They showed five typical lumbar spine vertebral bodies in unchanged alignment with intact L5-S1 posterior fusion hardware. (R. at 643.) No instability was seen on flexion or extension views, nor was there compression deformity or spondylosis. (*Id*.) Disc spaces were also within normal limits and the facet joints appeared anatomically aligned. (*Id*.) The impression was intact posterior fusion hardware without instability on flexion or extension views. (*Id*.) Upon examination, Plaintiff's lumbar range of motion was noted to be "limited due to pain with ROM" but her strength scores were identical to the strength scores she had prior to her post-surgical fall. (R. at 645, 638.)

4. Precision Pain Care in 2018

Plaintiff returned to Precision Pain Care five months after her lumbar fusion. (R. at 772.) She reported that although the surgery reduced symptoms on her right, she now had similar pain radiating from her low back into her left lower extremity. (*Id*.) It was recommended that she receive lumbar steroidal epidural injections to reduce the apparent radicular component of her pain. (*Id*.) She received an injection on October 29, 2018. (R. at 773.)

5. State Agency Reviewers Drs. Jasti and Sreenivas

On April 3, 2017, Plaintiff's file was reviewed at the initial level by Dr. Jasti. (R. at 104–05.) Dr. Jasti found that Plaintiff was capable of light work except that she was limited to frequent stooping; occasionally climbing ramps and stairs; and never climbing ladders, ropes, and scaffolds. (*Id*.) On May 31, 2017, Plaintiff's file was reviewed at the reconsideration level by Dr. Sreenivas. (R. at 121–22.) Dr. Sreenivas found that Plaintiff was capable of light work except that she was limited to frequent balancing and crouching; occasionally stooping, kneeling, crawling, and climbing ramps or stairs; and never climbing ladders, ropes, and scaffolds. (*Id*.)

**C.    Relevant Medical Records Related to Plaintiff's Mental Impairments**[1]

1. School Records

School records show that Plaintiff was placed on a student accommodation plan in grade 8 for low grades, poor standardized test scores and attendance, and high frustration level with school. (R. at 274.) The accommodations deemed necessary were modification of assignments/directions, additional time for assignments/tests, small group work/testing, use of a calculator, having all or part of tests read, and additional breaks for movement or to get back on task. (*Id*.) Plaintiff's high school grades ranged from As to Fs. She failed to pass the Ohio Ninth Grade Proficiency test despite taking it several times. (R. at 271, 273.) Elsewhere, Plaintiff reported that she did not complete the twelfth grade as she lacked two credits. (R. at 336.)

---

[1] Plaintiff's allegations of error pertain only to her borderline intellectual functioning. Accordingly, the Undersigned focuses her discussion on evidence related to the same.

2.    2007 Consultative Examination by T. Rodney Swearingen, PhD.

Plaintiff was consultatively evaluated by Dr. Swearingen, on December 8, 2007, to assess cognitive and memory functions and identify any behavior or emotional problems.  (R. at 336–41.)  Plaintiff was 22 years old on that date.  (R. at 336.)  She reported that she was going to take her GED in the near future, that she had done well and enjoyed school, and that she got along with other students and teachers but had attendance problems.  (R. at 337.)  She had no contact with her neighbors but denied problems with them or authority figures.  (*Id*.)  Plaintiff also denied having problems getting along with people or following directions at her last job, but she had difficulty completing repetitive tasks due to distractions and was unable to work at that time because she could not "stand to be around people" and had panic attacks.  (*Id*.)  She denied having difficulty managing money.  (R. at 338.)  She spent her days at home watching television and had one good friend with whom she socialized at home.  (*Id*.)  She reported that her reading skills were fair but that her writing, spelling, and arithmetic skills were poor.  (*Id*.)  She completed her ADLs independently.  (*Id*.)

Dr. Swearingen administered the WAIS–II to Plaintiff.  Plaintiff scored 76 on Performance IQ, 66 on Verbal IQ, and 68 on the Full Scale IQ.  (R. at 339.)  These scores fell in the borderline range for Performance IQ and extremely low range for Verbal IQ and the Full Scale IQ.  (*Id*.)  Dr. Peterson also administered the WRAT–III to Plaintiff who scored in the low average range in sentence comprehension (81) and spelling (84) and in the borderline range for word reading (77), math computation (74), and reading composite (77).  (*Id.*)  Dr. Swearingen opined that these scores warranted an Axis II diagnosis of borderline intellectual functioning.

(*Id*.)  He further opined that her GAF rating was "58 or a moderate impairment."  (*Id*.)  Dr. Swearingen wrote that Plaintiff's ability to relate to others including co-workers and supervisors and to withstand stress and pressure related to work was moderately impaired.  (R. at 339–40.)  Plaintiff's ability to understand and follow simple directions, persist, and maintain a moderate pace appeared to be intact.  (*Id*.)  Her ability maintain attention also appeared to be intact, but Dr. Swearingen noted that Plaintiff was in a controlled environment with little distraction and that her ability in this area was likely to be at least mildly impaired by her mental health symptoms.  (*Id*.)

### 3.      Integrated Services for Behavioral Health ("ISBH")

Plaintiff began treating at ISBH in April 2016.  Session notes written by Ruth Porter-Roberts, LSW, indicated that Plaintiff was on probation after being incarcerated for 90 days for felony drug and children endangerment convictions.  (R. at 350.)  Plaintiff reported a history of special education.  (R. at 351.)  LSW Roberts wrote that Plaintiff's GAF rating was a 45, which indicated serious symptoms or impairments in social, occupational, or school functioning.  (R. at 353.)  Upon a brief mental status examination, Plaintiff's thought processes were goal directed and logical.  (R. at 354.)  She was oriented x3, her short and long-term memory were intact, and her insight was good. (*Id*.)

A mental status examination on June 22, 2016, done by psychiatrist Erin Roylance, D.O., at ISBH revealed that Plaintiff's thought processes were logical and relevant, and her thought content was appropriate.  (R. at 362.)  Plaintiff's immediate, recent, and remote memory were all intact.  (R. at 363.)  Plaintiff had fair concentration, insight, and judgment and was estimated to

have above average intelligence. (*Id*.) Mental status examinations done by Dr. Roylance on July 13, August 10, October 3, and November 29, 2016, and January 23, and March 1, 2017 found that Plaintiff's thought process and content were logical, her cognition was intact, and her insight/judgment was fair. (R. at 386, 394, 402–03, 410, 418, 426.)

On March 17, 2017, Ms. Volquardsen, a therapist at ISBH, completed an Opportunities for Ohioans with Disabilities Daily Activities Questionnaire which asked "[i]f applicable, what behaviors or deficits prevent independent living?" (R. at 451–52.) Ms. Volquardsen responded "ADHD, depression, drug abuse" but did not identify cognitive deficits. (*Id*.) In addition, in response to a question asking for examples of anything that might prevent work activities, Ms. Volquardsen responded: "Back issues prevent standing for long periods, lifting and squatting. Anxiety prevents client from interacting with others. Client has trouble with attendance due to depression," but she did not identify cognitive issues. (*Id*.) Ms. Volquardsen also wrote that Plaintiff did not do a lot of food preparation but microwaved her meals and did limited housework at her own pace depending on how she was feeling. (*Id*.) She had no issues, however, with personal hygiene. (*Id*.) Ms. Volquardsen noted that Plaintiff spent limited time in stores due to anxiety, but she used public transportation because she had no driver's license. (*Id*.) Ms. Volquardsen also noted that Plaintiff's father assisted with banking, bill paying, and grocery shopping. (*Id*.) Ms. Volquardsen indicated that Plaintiff was very reliable about keeping her appointments which took place one to two times per week. (*Id*.)

On June 27, 2018, Plaintiff's saw Amanda Pack, CNP, as a transfer patient from Dr. Roylance. (R. at 662–670.) A mental status examination that day, Plaintiff's speech,

associations, thought process, orientation, recent and remote memory, language, and knowledge fund were all normal.  (R. at 667–68.)  Her insight was fair.  (R. at 667.)  Her attention and concentration were, however, abnormal.  (R. at 668.)  Mental status examinations on August 6, and September 11, and October 12, 2018, again found that Plaintiff's speech, associations, thought process, orientation, and recent and remote memory were all normal and that Plaintiff's insight was fair.  (R. at 678–79, 689–90, 699–700.)  But on those dates, Plaintiff's attention and concentration were also normal.  (R. at 679, 690, 700.)

4.      State Agency Reviewers Drs. Kirwin and Rudy

On March 28, 2017, Plaintiff's file was reviewed at the initial level by Dr. Kirwin.  (R. at 106–08.)  Dr. Kirwin found that Plaintiff was capable of performing simple repetitive tasks (1–3 steps) in an environment without fast pace or high production quotas and occasional superficial interaction with others in the work setting.  (*Id*.)  Dr. Kirwin found that Plaintiff also retained the ability to respond appropriately to changes in the work setting that were foreseen and gradually implemented.  (*Id*.)  Dr. Rudy reviewed Plaintiff's file at the reconsideration level on May 25, 2017, and made identical findings.  (R. at 123–25.)

## III.   SUMMARY OF THE ADMINISTRATIVE DECISION

On April 5, 2019, ALJ Herring issued her decision. (R. at 15–29.)  ALJ Herring initially explained that because there had been a final determination on Plaintiff's prior application, she would be bound, pursuant to principles of *res judicata*, by the findings in that final determination for the adjudicated period.  (R. at 15.)  ALJ Herring also explained that she would be bound by the findings in the final determination for the unadjudicated period that began immediately after

the final determination had been issued in the absence of new and material evidence or evidence

of changed circumstances.  (R. at 16.)  ALJ Herring then concluded that Plaintiff's instant

application was for an unadjudicated period and thus *res judicata* principles did not apply.  (R. at

15–16.)  ALJ Herring further found that there was and new and material evidence showing

changed circumstances, and thus, that she was not bound by the prior determination for the

unadjudicated period.  (R. at 15–16.)

At Step One[2] of the sequential evaluation process, ALJ Herring found that Plaintiff had

not engaged in substantially gainful during the period since January 17, 2017, her application

date. (R. at 18.)  At Step Two, the ALJ found that through the date last insured, Plaintiff had the

following severe impairments: degenerative disc disease of the lumbar spine, borderline

intellectual functioning, bipolar disorder, major depressive disorder, generalized anxiety

---

[2] Social Security Regulations require ALJs to resolve a disability claim through a five-step
sequential evaluation of the evidence. *See* 20 C.F.R. § 404.1520(a)(4). Although a dispositive
finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th
Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?
2. Does the claimant suffer from one or more severe impairments?
3. Do the claimant's severe impairments, alone or in combination, meet or
   equal the criteria of an impairment set forth in the Commissioner's Listing of
   Impairments, 20 C.F.R. Subpart P, Appendix 1?
4. Considering the claimant's residual functional capacity, can the claimant
   perform his or her past relevant work?
5. Considering the claimant's age, education, past work experience, and residual
   functional capacity, can the claimant perform other work available in the national
   economy?

*See* 20 C.F.R. § 404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009);
*Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

disorder, borderline personality disorder, attention-deficit hyperactivity disorder (ADHD), post-traumatic stress disorder (PTSD), and opioid dependence. (*Id.*) She further found at Step Three that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 19.)

Before proceeding to Step Four, ALJ Herring set forth Plaintiff's residual functional capacity ("RFC") as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except that she could sit six hours in an eight-hour workday, but stand and/or walk for four hours in an eight-hour workday. Additionally, the claimant must be able to change positions between sitting and standing every 15minutes or more as needed; and must be able to shift weight while in a seated position. She could occasionally stoop, kneel, crouch, crawl, and climb stairs or ramps, but should avoid climbing ladders, ropes, or scaffolds. Further the claimant should avoid hazards – meaning dangerous machinery and unprotected heights. She could perform simple and routine tasks with no more than occasional changes in the work setting. Further, this work should not be at production rate pace, defined as where the production rate is set by an external source such as an assembly line or conveyor belt. Lastly, the claimant must work in an environment with occasional interaction with supervisors and co-workers, but should avoid interaction with the public.

(R. at 22.) When assessing this RFC, ALJ Herring gave little weight to an opinion from Plaintiff's therapist at ISBH, Ms. Volquardsen, because she was an "other source" instead of an acceptable medical source and her opinion conflicted with records from Plaintiff's treating and examining psychiatrist. (R. at 26.) ALJ Herring gave significant weight to the consultative evaluation conducted in December 2007 by Dr. Swearingen, because it was consistent with the

current medical records despite its age.  (R. at 27.)  ALJ Herring also accorded significant weight to the opinions of the State Agency reviewers, Drs. Jasti, Kirwin, Sreenivas, and Rudy because they were "grounded in the evidence of record."  (R. at 27–28.)

At Step Four, ALJ Herring determined that Plaintiff had no past relevant work. (R. at 28.) At Step Five, ALJ Herring relied on testimony from a Vocational Expert ("VE") to find that given Plaintiff's age, education, work experience, and RFC, Plaintiff could perform other jobs that existed in significant numbers in the national economy such as an inspector, hand packer, and bench assembler.  (R. at 29.)  Consequently, ALJ Herring concluded that Plaintiff had not been disabled under the Social Security Act since January 17, 2017. (*Id.*)

## IV.    STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial.  The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'"  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).  Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'"  *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## V.      ANALYSIS

Plaintiff alleges that ALJ Hering erred in her Listing analyses.  Specifically, Plaintiff alleges that ALJ Herring erred when determining that Plaintiff did not meet the criteria for Listings 1.04A and 12.05.  Plaintiff also alleges that ALJ Herring erred in her subjective-symptom analysis.  The Undersigned addresses each of these alleged errors and finds that they do not have merit.

### A.      The ALJ's Subjective Symptom/Credibility Analysis

Plaintiff alleges that the ALJ Herring erred in her assessment of Plaintiff's subjective symptoms.  The Undersigned disagrees.

The Sixth Circuit has provided the following guidance in considering an ALJ's credibility assessment:[3]

---

[3] An ALJ's consideration of a claimant's statements about symptoms and limitations, generally known as credibility analysis, is required.  But, as clarified by SSR 16-3p (applicable as of

Where the symptoms and not the underlying condition form the basis of the disability claim, a two-part analysis is used in evaluating complaints of disabling pain. 20 C.F.R. § 416.929(a); *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001); *Felisky v. Bowen*, 35 F.3d 1027, 1038-39 (6th Cir. 1994). First, the ALJ will ask whether the there is an underlying medically determinable physical impairment that could reasonably be expected to produce the claimant's symptoms. 20 C.F.R. § 416.929(a). Second, if the ALJ finds that such an impairment exists, then he must evaluate the intensity, persistence, and limiting effects of the symptoms on the individual's ability to do basic work activities. *Id.*

*Rogers*, 486 F.3d at 247.

"The ALJ's assessment of credibility is entitled to great weight and deference."

*Infantado v. Astrue*, 263 F. App'x 469, 475 (6th Cir. 2008) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)); *Sullenger v. Comm'r of Soc. Sec.*, 255 F. App'x 988, 995 (6th Cir. 2007) (declining to disturb the ALJ's credibility determination, stating that "[w]e will not try the case anew, resolve conflicts in the evidence, or decide questions of credibility" (citation omitted)). This deference extends to an ALJ's credibility determinations "with respect to [a claimant's] subjective complaints of pain." *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 652 (6th Cir. 2009) (quoting *Siterlet v. Sec'y of Health & Hum. Servs.*, 823 F.2d 918, 920 (6th Cir. 1987)). Despite this deference, "an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Walters*, 127 F.3d at 531. Furthermore, the ALJ's decision on credibility must be "based on a consideration of the entire record." *Rogers*, 486 F.3d at 247 (internal quotation omitted). An ALJ's explanation of his or her credibility decision "must be

---

March 28, 2016), the focus is not on the claimant's propensity for truthfulness or character but rather on the consistency of her statements about the intensity, persistence, and limiting effects of symptoms with the relevant evidence. *See* SSR 16-3p, 2017 WL 5180304 at *2, *6, *11. Consequently, the Court uses the term "credibility" in the context the consistency of Plaintiff's statements about her symptoms with the evidence in the record.

sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Id.* at 248; *see also Mason v. Comm'r of Soc. Sec. Admin.*, No. 1:06-CV-1566, 2012 WL 669930, at *10 (N.D. Ohio Feb. 29, 2012) ("While the ALJ's credibility findings 'must be sufficiently specific', *Rogers*, 486 F.3d at 248, the intent behind this standard is to ensure meaningful appellate review.").

"Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence." *Walters*, 127 F.3d at 531. In addition, the regulations list a variety of factors an ALJ must consider in evaluating the severity of symptoms, including a claimant's daily activities; the effectiveness of medication; and treatment other than medication. 20 C.F.R. § 404.1529(c)(3); SSR 96-7p, 1996 WL 374186 (July 2, 1996); *but see Ewing v. Astrue*, No. 1:10-cv-1792, 2011 WL 3843692, at *9 (N.D. Ohio Aug. 12, 2011) (suggesting that although an ALJ is required to consider such factors, he or she is not required to discuss every factor within the written decision) *report and recommendation adopted*, 2011 WL 3843703, (N.D. Ohio Aug. 30, 2011).

At the first part of the two-part analysis, ALJ Herring determined that Plaintiff had a medically determinable impairment that could reasonably be expected to cause her alleged symptoms. (R. at 22.) But at the second part, ALJ Herring determined that Plaintiff's statements concerning the intensity, persistence and limiting effects of those symptoms were not entirely consistent with the medical and other evidence in the record. (*Id.*) Plaintiff alleges that when ALJ Herring made that second determination, she failed to consider that Plaintiff's back impairments were serious enough to necessitate lumbar surgery, that Plaintiff's back pain may

have varied over time, and that Plaintiff persisted in efforts to obtain pain relief. (ECF No. 7, at PageID # 825–27.)

Plaintiff mischaracterizes the ALJ's subjective symptom analysis. ALJ Herring engaged in a lengthy discussion of the medical records related to Plaintiff's pre-surgery treatment, including the handful of injections that she received from Precision Pain Care in 2017, and that Plaintiff was referred for surgery in 2017. (R. at 23.) ALJ Herring then described the surgery that Plaintiff had on May 14, 2018, and subsequent physical examination findings. (*Id*.) ALJ Herring further noted that Plaintiff reported that she had fallen after her surgery and complained about back pain that she experienced after that post-surgical fall. (*Id*.) ALJ Herring then described examination findings from Plaintiff's post-fall medical visits and noted that objective diagnostic evidence showed that her fusion hardware remained intact despite her accident. (*Id*.) ALJ Herring also noted that although Plaintiff had been prescribed post-surgical physical therapy, there was no record evidence that Plaintiff had attended any such sessions and that Plaintiff sought only a single post-surgery lumbar injection at Precision Pain Care. (*Id*.) ALJ Herring concluded that this evidence supported the presence of a back impairment, but that it did not demonstrate the level of impairment alleged by Plaintiff. (*Id*.) The Undersigned finds no reason to disturb this determination.

Thus, contrary to Plaintiff's claims, ALJ Herring considered Plaintiff's pre-surgical, surgical, and post-surgical treatment records and explicitly discussed the efforts that Plaintiff took, or failed to take, to relieve her pain during all those times. (*Id*.) ALJ Herring's analysis accurately describes the information contained in medical records, and therefore, her analysis is supported by substantial record evidence. For these reasons, this allegation of error lack merit.

## B.     ALJ Herring's 1.04 Listing Analysis

Plaintiff additionally alleges that ALJ Herring erred when determining that she did not meet the criteria for Listings 1.04A.  This allegation also lacks merit.

The Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the Social Security Administration considers "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience."  20 C.F.R. § 416.925(a).  A claimant who meets or medically equals the requirements of a listed impairment will be deemed conclusively disabled.  *See Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x  411, 414 (6th Cir. 2011).  That said, "[a] claimant must satisfy all of the criteria to meet the listing."  *Rabbers*, 582 F.3d at 653; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) ("For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria.  An impairment that manifests only some of those criteria, no matter how severely, does not qualify."); *Blanton v. Soc. Sec. Admin.*, 118 F. App'x 3, 6 (6th Cir. 2004) ("When all the requirements for a listed impairment are not present, the Commissioner properly determines that the claimant does not meet the listing.").  All criteria must also be met concurrently for a period of twelve continuous months.  *See* 20 C.F.R. § 416.925(c)(3), (4); 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(D) ("[b]ecause abnormal physical findings may be intermittent, their presence over a period of time must be established by a record of ongoing management and evaluation.").  A claimant bears the burden of proving that she meets or equals all of the criteria of a listed impairment.  *Malone v. Comm'r of Soc. Sec.*, 507 F. App'x  470, 472 (6th Cir. 2012); *Her v. Comm'r of Soc. Sec.,* 203 F.3d 388, 391 (6th Cir. 1999)

(clarifying that the burden of proving disability remains with the Social Security claimant at Steps 1 through 4 and does not shift to the ALJ until Step 5).

Listing 1.04A provides as follows:

1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), *resulting in compromise of a nerve root* (including the cauda equina) or the spinal cord. With:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

20 C.F.R. Pt. 404, Subpt. P, App, 1, §1.04A (emphasis added). Therefore, Plaintiff was required to establish each of the following seven criteria in order to demonstrate that she met Listing 1.04A:

(1)    A disorder of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture),
(2)    resulting compromise of a nerve root (including the cauda equina) or the spinal cord,
(3)    evidence of nerve root compression characterized by neuro-anatomic distribution of pain,
(4)    limitation of motion of the spine,
(5)    motor loss (atrophy with associated muscle weakness or muscle weakness [*sic*] ) accompanied by sensory or reflex loss,
(6)    if there is involvement of the lower back, positive straight-leg raising test (sitting and supine), and
(7)    the impairment has lasted or can be expected to last for a continuous period of at least 12 months.

In this case, however, ALJ Herring determined that Plaintiff did not meet that burden of proof. She wrote:

The criteria in Listing 1.00, Musculoskeletal System, more specifically 1.04 Disorders of the Spine, is not satisfied. The medical evidence fails to establish any disorder of the claimant's spine, such as osteoarthritis, herniated nucleus

22

pulposus, spinal arachnoiditis, spinal stenosis, or degenerative disc disease that *results in the compromise of a nerve root or the spinal cord*, thereby failing to meet the requirement of Listing 1.04.

(R. at 19.) (emphasis added).

ALJ Herring's discussion of Listing 1.04A at Step Three is somewhat cursory. But when read in its entirety, ALJ Herring's non-disability determination demonstrates that substantial evidence supports her Listing 1.04A conclusion. ALJ Herring noted elsewhere in the determination that "the record does contain objective diagnostic studies of an impairment." (R. at 22.) Specifically, a December 2017, MRI showed "grade 1 anterolisthesis of L5 on S1 with chronic bilateral pars defects and moderate disc degeneration associated with mild to moderate bilateral foraminal stenosis." (R. at 22–23, 770.) But ALJ Herring also noted that approximately five months later, Plaintiff underwent surgery. (R. at 23, 606.) ALJ Herring explained that Plaintiff fell on her back approximately one month after her surgery, but subsequent X-Rays did not indicate abnormalities. (R. at 23.) In particular, ALJ Herring discussed that X-Rays on September 13, 2018, showed five typical lumbar spine vertebral bodies in unchanged alignment with intact L5-S1 posterior fusion hardware and that Plaintiff had no instability on flexion or extension views. (R. at 23, 642–43.) There was also no compression deformity or spondylosis on those same X-Rays. (*Id*.) In addition, Plaintiff's disc spaces were within normal limits and her facet joints appeared anatomically aligned. (*Id*.) Therefore, it is clear, from ALJ Herring's determination that there was no recent evidence that Plaintiff's mild to moderate foraminal stenosis resulted in compromise of the nerve root or spinal cord. *See Lett v. Colvin*, No. 1:13 CV 2517, 2015 WL 853425, at *17 (N.D. Ohio Feb. 26, 2015) (finding that plaintiff did not meet her

burden where she failed to establish more recent evidence that she met the criteria for Listing 1.04A).

Plaintiff asserts that ALJ Herring's analysis is inadequate and cites *Reynolds* for the proposition that when performing a Listing analysis, an ALJ must "actually evaluate the evidence, compare it to Section 1.00 of the Listing, and give an explained conclusion, in order to facilitate meaningful judicial review." 424 Fed. App'x at 416. In *Reynolds*, the ALJ found that the claimant had severe mental and physical impairments at Step Two, but at Step Three, the ALJ analyzed only whether the claimant's mental impairments met or equaled a Listing, and completely failed to assess whether the claimant's physical impairments met or equaled any Listings. *Id*. at 415–16. The Sixth Circuit Court of Appeals found that remand was appropriate because the ALJ "completely skipped an entire step of the necessary analysis." *Id*. In this case, however, ALJ Herring did not completely fail to consider if Plaintiff's physical impairments met any listed impairments. Here, however, ALJ Herring explicitly considered Listing 1.04A. And although her analysis may have been brief, when combined with her detailed discussion of the record evidence related to Plaintiff's spinal impairments, it provided sufficient articulation for adequate judicial review. Moreover, on several occasions, the Sixth Circuit has upheld an ALJ's sparse step three determination when an ALJ made "sufficient factual findings elsewhere in his decision to support his conclusion at Step Three." *Forrest v. Comm'r of Soc. Sec.*, 591 Fed. App'x 359, 366 (6th Cir. 2014) (*citing See Bledsoe v. Barnhart,* 165 Fed. App'x 408, 411 (6th Cir. 2006) (looking to findings elsewhere in the ALJ's decision to affirm a Step Three medical equivalency determination, and finding no need to require the ALJ to "spell out every fact a

second time")). Such is the case here. Accordingly, the Undersigned finds that the ALJ did not err when analyzing if Plaintiff met the criteria for Listing 1.04A.

In any event, Plaintiff cannot point to evidence of requirement number 6 for Listing 1.04A— positive straight leg tests in both the sitting and supine positions. Although medical records document two positive straight-leg raising tests prior to Plaintiff's surgery, the records do not indicate if those tests were performed in either the sitting and standing positions. Therefore, those tests do not demonstrate the Plaintiff met Listing 1.04A. *Asbury v. Comm'r of Soc. Sec.*, No. 1:18–cv–365, 2019 WL 3916479, at *10 (S.D. Ohio Aug. 20, 2019), (finding plaintiff could not meet Listing 1.04A where there was "no indication" if straight leg raising tests were positive for both the supine and sitting positions as Listing 1.04A requires"), *report and recommendation affirmed*, 2019 WL 4452677, (S.D. Ohio September 17, 2019); *Miller v. Comm'r of Soc. Sec.*, No. 1:10–cv–122778, 848 F. Supp. 2d 694, 710 (E.D. Mich. Oct. 21, 2011) (finding the plaintiff could not meet Listing 1.04A where she did not point to "positive straight leg tests in both the sitting and supine positions"). In addition, the medical records document two post-surgical positive straight leg raising tests. (R. at 663, 639.) But the records indicate only that those tests were done in the sitting position. (*Id*.) Those tests results do not suffice because Listing 1.04A requires evidence of positive tests in both the sitting <u>and</u> the standing positions. 20 C.F.R. Pt. 404, Subpt. P, App, 1, §1.04A. Therefore, Plaintiff cannot satisfy her burden of demonstrating that she meets all the criteria for Listing 1.04A. Thus, even if the ALJ had erred when analyzing Listing 1.04A, any such error would have been harmless. For these reasons, the Undersigned concludes that Plaintiff's allegation of error lacks merit.

### C.    ALJ Herring's Listing 12.05 Analysis

Plaintiff also alleges that the ALJ erred by failing to consider if Plaintiff met the criteria for Listing 12.05.  The Undersigned finds that this allegation lacks merit.

At Step Three, the regulations require an ALJ to determine if a claimant meets or equals a Listing, but they "do not require the ALJ to address every Listing" or to "discuss listings that the applicant clearly does not meet."  *Sheeks v. Comm'r of Soc. Sec.*, 544 Fed. App'x  639, 641 (6th Cir. 2013).  Instead, an ALJ should consider a Listing if the record "'raise[s] a substantial question as to whether [the claimant] could qualify as disabled' under a listing."  *Id*. at 641 (citing *Abbott v. Sullivan*, 905 F.2d 918, 925 (6th Cir. 1990)).  "A claimant must do more than point to evidence on which the ALJ could have based his finding to raise a 'substantial question' as to whether he satisfied a listing."  *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x  426, 432 (6th Cir. 2014) (quoting *Sheeks*, 544 F. App'x  at 641–42).  "Rather, the claimant must point to specific evidence that demonstrates he reasonably could meet or equal every requirement of the listing."  *Id.* (citing *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)).  "Absent such evidence, the ALJ does not commit reversible error by failing to evaluate a listing at Step Three."  *Id.* at 433.  Furthermore, "where the ALJ makes findings elsewhere in the decision supporting the conclusion that the claimant did not meet a listing, the Court may affirm the decision because an ALJ need not 'spell out every fact a second time.'"  *Bledsoe*, 165 F. App'x  at 411; *see also Forrest*, 591 F. App'x  at 366 (explaining that the ALJ's step three findings may be upheld where there are "factual findings elsewhere in his decision to support his conclusion.").

At Step Two, ALJ Herring determined that Plaintiff had several severe medically determinable mental impairments, including borderline intellectual functioning. (R. at 18–19.) At Step Three, ALJ Herring considered mental impairments and determined that they did not, singly or in combination, meet the criteria for any of the following Listings: 12.04 (Depressive, bipolar and related disorders); 12.06 (Anxiety and Obsessive-compulsive disorders); 12.08 (Personality and impulse control disorders); 12.11 (Neurodevelopmental disorders); and 12.15 (Trauma and Stressor-related disorders). (R. at 20.) Nevertheless, and as Plaintiff correctly points out, ALJ Herring failed to mention or discuss whether Plaintiff met the criteria for Listing 12.05 at Step Three. [4]

### 1. 12.05A

Listing 12.05 addresses intellectual disorders and sets forth two paths for satisfying its requirements. Listing 12.05A applies to people whose intellectual disorders make them unable to take standardized tests of intellectual functioning. It provides as follows:

A. Satisfied by 1, 2, and 3 (see 12.00H):

1. Significantly subaverage general intellectual functioning evident in your cognitive inability to function at a level required to participate in standardized testing of intellectual functioning; and

2. Significant deficits in adaptive functioning currently manifested by your dependence upon others for personal needs (for example, toileting, eating, dressing, or bathing); and

---

[4] The Commissioner asserts that Plaintiff "incorrectly claims" that ALJ Herring did not mention or evaluate Listing 12.05. (ECF No. 9, at PageID # 840.) But Defendant cites the determination issued by ALJ Sferrella on July 20, 2010, not the determination issued by ALJ Herring on April 5, 2019. (*Id.*, at PageID # 841.) As explained, *supra*, however, ALJ Herring determined that she was not bound by the findings in the prior determination issued by ALJ Sferrella pursuant to principles of *res judicata* or under *Drummond* and she did not adopt ALJ Sferrella's findings (R. at 15–16.)

3. The evidence about your current intellectual and adaptive functioning and about the history of your disorder demonstrates or supports the conclusion that the disorder began prior to your attainment of age 22.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05.

In this case, the ALJ did not err by failing to consider Listing 12.05A because the record did not raise a substantial question as to whether Plaintiff met that Listing. The record contains evidence that Plaintiff was able to participate in standardized testing. Indeed, the record contains Plaintiff's scores on several standardized intellectual functioning tests the WAIS–III and the WRAT–III. (R. at 339.)

2. 12.05B

Listing 12.05B applies to people whose intellectual disorders do not make them unable to participate in standardized tests of intellectual functioning. Listing 12.05B provides as follows:

B. Satisfied by 1, 2, and 3 (see 12.00H):

1. Significantly subaverage general intellectual functioning evidenced by a or b:

   a. A full scale (or comparable) IQ score of 70 or below on an individually administered standardized test of general intelligence; or

   b. A full scale (or comparable) IQ score of 71–75 accompanied by a verbal or performance IQ score (or comparable part score) of 70 or below on an individually administered standardized test of general intelligence; and

2. Significant deficits in adaptive functioning currently manifested by extreme limitation of one, or marked limitation of two, of the following areas of mental functioning:

   a. Understand, remember, or apply information (see 12.00E1); or

   b. Interact with others (see 12.00E2); or

   c. Concentrate, persist, or maintain pace (see 12.00E3); or

28

        d.      Adapt or manage oneself (see 12.00E4); and

3.    The evidence about your current intellectual and adaptive functioning and about the history of your disorder demonstrates or supports the conclusion that the disorder began prior to your attainment of age 22.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05.

In this case, the ALJ did not err by failing to consider Listing 12.05B because the record did not raise a substantial question as to whether Plaintiff met that Listing. When ALJ Herring considered other Listings at Step Three (Listings 12.04, 12.06, 12.08, 12.11, and 12.15), she determined that Plaintiff did not meet the "paragraph B" criteria for those Listings. That paragraph B criteria requires a claimant's "mental disorder" to result in "extreme" limitations in one out of four, or "marked" limitations in two out of four, areas of mental functioning. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00. Those four areas of mental functioning are: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself. *Id.* ALJ Herring determined that Plaintiff had only moderate limitations in all four of those areas. (R. at 20–21.)

The paragraph B criteria for Listings 12.04, 12.06, 12.08, 12.11, and 12.15 are identical to the requirements for 12.05B(2)(a)–(d), which requires "extreme" limitations in one out of four, or "marked" limitations in two out of four, of the same four areas of mental functioning. Compare 20 C.F.R. Pt. 404, Subpt. P, App. 1§ 12.00(A)(2)(b) ("paragraph B criteria") to 12.05B(2)(a)–(d). After ALJ Herring determined that Plaintiff only had moderate limitations in those four areas when considering Listings 12.04, 12.06, 12.08, 12.11, and 12.15, ALJ Herring

did not need to consider 12.05B because the evidence did not raise a "substantial question" as to whether Plaintiff could meet that Listing. As noted, an "ALJ need not discuss listings that the applicant clearly does not meet." *Sheeks*, 544 F. App'x at 641. ALJ Herring was not required to "spell out every fact a second time" to show why Plaintiff could not meet the requirements of 12.05B. *Bledsoe*, 165 F. App'x at 411. Therefore, ALJ Herring did not commit reversible error by failing to expressly consider listing 12.05B. *See Forman v. Saul*, No. 7:19-CV-043-CHB, 2020 WL 5521038, at *2–5 (E.D. Ky. Sept. 14, 2020) (finding that the record did not raise a substantial question as to whether the plaintiff could meet Listing 12.05B; the ALJ found that the plaintiff could not meet the paragraph B criteria in other Listings and that paragraph B criteria was identical to the requirements in 12.05B(2)(a)-(d)).

This case is also distinguishable from *Reynolds*, cited by Plaintiff. As explained previously, in *Reynolds*, the ALJ determined that the plaintiff had severe physical impairments at Step Two, but at Step Three, failed to analyze if those physical impairments met any Listing at all. 424 F. App'x 415–16. Such is not the case here. ALJ Herring determined that Plaintiff had severe mental impairments at Step Two, and at Step Three, explicitly determined that those mental impairments did not meet Listings 12.04, 12.06, 12.08, 12.11, and 12.15. (R. at 19–20.) That explicit determination made it clear that the record did not raise a substantial issue question about Listing 12.05. *Reynolds* is thus distinguishable. For these reasons, the Undersigned concludes that Plaintiff's allegation of error related to Listing 12.05 is without merit.

## VI.   CONCLUSION

For all the foregoing reasons, it is therefore **RECOMMENDED** that Plaintiff's Statement of Errors be **OVERRULED** and that the Commissioner's decision be **AFFIRMED**.

## VII.   PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court.  *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding thatdefendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation).  Even when timely objections are filed, appellate review of issues not raised in those objections is waived.  *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . . ") (citation omitted)).

**Date:**   July 6, 2021                    /s/ *Elizabeth A. Preston Deavers*
                                 **ELIZABETH A. PRESTON DEAVERS**
                                 **UNITED STATES MAGISTRATE JUDGE**